Mr. Castanis here for the appellant, Ms. Flanagan here for the appellee. Whenever you're ready. Thank you, Your Honor, and may it please the court. The almost $20 million judgment here is one of the largest trademark judgments in recent history. It is legally unsustainable. This court should reverse. The court will indulge me for just a moment. I'll tell you the reasons why, and then the court can direct me if there are particular questions that you have. There are three paths to reversal as a matter of law. One, battery tender is generic. Two, DTC proved no likelihood of consumer confusion. And three, DTC, an IP holding company, failed to prove the fact of injury. Second ground, and these are grounds for a new trial, there are three separate reasons that a new trial should follow. One, the district court erred by instructing the jury that it could find trademark infringement if Noco used the word tender alone. Second, DTC was allowed to pursue a theory that keyword bidding could be trademark infringement. And third, the district court erred by sua sponte giving a false advertising instruction when that claim was never pleaded, was not in the pretrial order, and was not proved at trial. And then finally, as to relief, I'll have two main points. One is that the $12 million Discouragement Award gave DTC 100% of Noco's sales of its battery charges from all sources, not just from Amazon.com. Discouragement should have been tied in some reliable way to the acts of infringement alleged, as this court's decisions in cases like Sleptone and Hard Candy illustrate. And then finally, in addition to DTC's failure to prove the fact of damage, its claim under the Florida Unfair Practices Statute, which is the subject of a letter we've received from the court and that we've responded to, cannot sustain the $1.3 million damages verdict because of its failure to prove actual consumer harm. Can we start where you started with genericness, genericity, whatever the word would be? I've been using genericness, but whatever you like, Your Honor. So I mean – so I get it that there are two paths here, one that it's always been generic, one that it has become generic. As to the – at least as to the former, I'll just say like I don't think you're right about that for this very sort of foolish reason maybe. I mean to pull the curtain back, when I read the first line of my clerk's bench memo to me and it says this case is about whether the term battery tender is generic, my reaction was what in the heck is battery tender? I mean so it took me a lot of imagination to figure out what was going on. It wasn't until about line four that I said, oh, it tends the battery. Who would have ever thought that that's what battery tender meant? So isn't that some indication that this thing has not always been generic? No, I don't think that's an indication that it's not been generic at all because if you look at, for example, the formulation that's used in the First Circuit's Boston Duck Tours case. The question is are you claiming a genus or are you claiming something that is something other than that? This is like welding services. I mean for that matter, think of words or terms like coffee filter or baby stroller. There are other things that you could use to describe those things. You could have called a coffee filter, a coffee strainer. You could call a baby stroller a baby walker. But the simple fact is that it tells you not what the origin of the goods is, but it tells you what the genus of it is. It's things that tend batteries. And if you look at the evidence in this case, the evidence is one-sided and completely overwhelming. Consumers understand that. The general public understands it. Even competitors understand battery tenders to be a particular type of thing, not an indication of source or origin. So do you think battery tender is just as obvious as you suggest in the brief as bartender? Yes. Really? Absolutely. In fact, if I tried to, I mean the simple fact is that if you look at the evidence of record, which included articles from third parties, it included a survey that was unrebutted. And as we pointed out in our brief, surveys are de rigueur when it comes to generic-ness challenges. And even this court's unique skepticism towards surveys is really only limited to likelihood of confusion issues. There's no holding from this court or no suggestion that surveys on generic-ness are not appropriate. And, of course, McCarthy says they're de rigueur in generic-ness. But you can have generic terms, right, that become a mark just because battery is a generic term and tender is a generic term. But battery tender together may become a trademark even though they're generic terms. Well, they're separate words, but the term is battery tender.  I understand. But the question is whether or not battery tender, because battery obviously is generic. Tender is generic by itself. But the question is, does battery tender taken as a whole, does it become a mark as opposed to just a generic term? It does not. It does not. And the reason is that it takes that common noun and is it gerund? I'm not entirely sure what the part of speech is. Just like coffee filter, just like baby stroller, just like water filter, coffee grinder, phone charger. But all those things, Judge Newsom is correct. I had no idea what a battery tender was either. I had to look it up and look at the pictures, and then I understood what it was. So a coffee filter, I don't need a picture for that. I know what that is. Well, for example, though, phone charger. And before cell phones existed, if I told you that I had a phone charger, you would have gone, well, what is that? I never need to charge my phones. But, of course, it was generic then because all it is is just telling you what the good is. Isn't your problem, I suppose, unlike my colleagues, I actually did have an idea. And to me, it's a form of a trickle charger. When you say tender, tender to me does not necessarily describe what this does. I get that now it's taken on. Now we know what it means because a company has named it a battery tender, and we now know that it's essentially this trickle charger. So I think that, to me, is the difference between the examples. When you say phone charger, yes, it charges the phone. If you had said, you know, if they had tried to trademark battery trickle charger, then I might agree with you, but battery tender to me, because tender can mean many different things, that to me sort of works against your argument. Well, I think it's well and good, Your Honor, for judges and lawyers to talk about what they think, but let's look at what the evidence showed. Let's do that. We had a survey. We had an unrebutted survey. It was done according to every proper rule set forth in the Federal Judicial Manual for Scientific Evidence. And it showed what? That 78% of the consumers who were presented with this term thought it was a thing, not a source of goods. 11% only thought it was a brand. And 11%, and this is really important, because all of their arguments against the survey go to the question of, do you survey the right universe or shouldn't he have surveyed people who knew things? Well, we had a third option of I don't know, and 11% said I just don't know. So there was an opportunity. The survey was overwhelming evidence. The jury was not at liberty to disbelieve that and all of the other evidence. Do you mean that you think surveying, if we grant the premise of the objection of the survey, that surveying the wrong group of people is not a valid methodological objection? It's a valid methodological objection in certain circumstances, but it's not on the facts of this case, because the only objection is you should have surveyed people who did know. And the survey, by giving the opportunity to take a look to answer I don't know, allowed you to see that 78% said it's a thing, 11% said it's a brand, and 11% are the people they say shouldn't have been surveyed. So you can throw them out. And the numbers that think it's a thing and not a brand become even higher, because 78 out of 89 is even higher than 78%. And so your position is that the jury in this case simply had to accept the survey. There is no universe in which it could say, hey, we've looked at the survey. We've heard the objections. We just don't buy it. I think that there is no universe in which the jury could decline to accept all of the evidence here, the term itself, the survey, the other evidence that we offered and that we've rehearsed in our brief. Can I ask you one question?  Because I know that you're running short on time. So with respect to infringement, your brief and certainly the amicus brief are all about one kind of thing, right, the sort of excessive keyword purchases. Our brief is about more than that, but we do address that that was an illegitimate theory. Yeah. I guess I would say that's a focus of the brief. But there are other things going on, you recognize, right? I mean like in which the term battery tender shows up in the text of ads. The amicus even says, hey, that would be a different ballgame. Right. So let me unpack the infringement issue for you. Our opponents put forth broadly two distinct theories of trademark infringement, one of which was this keyword bidding. The other was, well, you've used our mark in these ads and more than a battery tender, for example. So here's why we get J-Mal on trademark infringement. The keyword ads, not actionable for all the reasons the amicus, the amici, and we have said. Now, the other uses, maybe they've shown uses. The term tender, which is a separate problem with regard to the jury instruction, but the term tender, the term more than a battery tender, occasional uses of the term battery tender by itself without more. Those are uses. Where's the confusion? Florida International University, the case from this court says the two most important of the likelihood of confusion factors are the strength of the mark and instances of actual confusion. And remember, again, they don't have a survey. Strength of the mark, even if it's not generic, it's extraordinarily weak on the Abercrombie and Fitch spectrum. Evidence of actual confusion? At best, three pieces, one of which is somebody writing to NOCO about a Deltran charger, somebody writing to Deltran about a NOCO charger, and a third chat transcript that was started by one of their employees writing to us saying, do you sell battery tenders? And our employee answered quite correctly that battery tenders are a thing, but Deltran claims to be having a mark in battery tender. Now, I'm getting to the point where I'm going to be eating into my rebuttal, but I do want to answer the question about that's three instances. Why isn't that enough? Well, two answers, Your Honor. Judge Kidd, first, none of those have anything to do with anything on Amazon.com. They're not tied to the uses. Secondly, the case law, and this is set forth in our brief, is that sporadic, isolated, two consumers who were confused as to, and not attentive as to which product they were asking about, they say these ads have been seen millions of times. If you would expect a likelihood of confusion, you wouldn't have three instances of alleged confusion completely untethered to these millions of ad sites. The cases we've cited in our brief say very clearly that those are de minimis and not actionable. There is no evidence of that. Now, I'm going to use just a little bit more of my rebuttal time to make another very important point with regard to judgment as a matter of law. DTC is a holding company. It owns intellectual property. It doesn't spend money on ads. It didn't lose any licensing revenue, and it disclaimed a lost profits theory. There is no proof of any injury in fact, not just for trademark, but also for any of the other claims that they've asserted here. DTC claimed that they needed money, and they got $1.3 million to pay for goodwill. Where's the evidence that they lost any goodwill? They have a single captive licensee, and that single captive licensee didn't demand a lower royalty. DTC didn't pay advertising costs. Mr. Prellick Jr. testified they don't buy advertising. Any advertising cost was incurred only by Deltran USA. That's not the plaintiff in this case, and the Supreme Court's decision in Dewberry says that corporate separateness matters for purposes of the Lanham Act. Unless the court has further questions at this point, and I don't want to because the court did ask me to address at argument the certification issue that you put in your memo. We gave you a letter to try to save some time and be able to use the argument for other things, but if you have any questions for me, I'm happy to answer those. Otherwise, I'll return and rebuttal. Okay, very well. Thank you so much. Ms. Flanagan. Good morning. May it please the court. I'm Patricia Flanagan of Schutzen Bone, and I'm joined by my colleague Camilla Chediak, also of Schutzen Bone, on behalf of the Appley Plaintiff, Deltona Transformer Corporation. I wanted to start this morning by just thanking you all for being here and considering these issues in this case today. We brought this case back in 2019, and it was tried in 2020. It's been a long road to get here, and we are hopeful to have a resolution of this case at some point. So I thank you for, and I'm grateful to be here today. My client's principal is Michael Prelick Sr. The company was started by his father and grandfather in the early 90s. The battery charger that was created was a new product that they came up with. The name battery tender, a new name that didn't exist anywhere in the market at that time. Counsel talked at length about this generic, that the mark has always been generic, and that's consistent with the trial theory directly contrary to arguments that were made throughout the trial. What about the fact, even if it hasn't always been generic, that it has become generic over time as evidenced by the survey? Yes. So during the trial, we had talked a lot about the date of January 28, 2014. And that is the first piece of evidence that we were able to identify during discovery of NOCO using battery tender in an email communication. So that became the guidepost at the district court level of when they have to prove that the mark had become generic. And the law is very clear on that. You have to show generic happened before you use the mark in commerce because you can't benefit from the confusion that you've created in the market. So that date became the guidepost. Anything before it could be used for purposes of determining whether the mark had become generic. Anything after it was simply actual confusion. To the argument in terms of there wasn't actual confusion presented during the trial, there was significant evidence of actual confusion presented. There were numerous spreadsheets that NOCO had produced that list out all these consumer communications that talk about and reference battery tender in referring to NOCO's products. One of those, for example, is PX304, which is in the record. For example, I recently purchased a G7200, and when charging the device, it makes a hissing noise on and off. I have taken a video. The power is clean, and my previous capitalized battery tender does not make a noise like that. Is it normal? So I have a laundry list of other things that are specifically pulled from that spreadsheet that list out the evidence. We also have the additional emails that counsel pointed to, including PX162A, where a supplier, a distributor in the marketplace had reached out to NOCO and said, I'm interested in this particular product, included a link to a battery tender branded product that my client manufactured concerning a new Wi-Fi device. And that attachment, which is the link shown, is 162B, PX162B in the record. So there's significant evidence of actual confusion. You don't see anything in the record before January 28, 2014. There's not a single reference. The cases that have found a mark to have become generic, for example, Pilates from the Ninth Circuit, there's hundreds and hundreds of media, hundreds of newspapers, dictionary definitions. There's a tremendous amount of evidence. In this case pre-2014, there's absolutely nothing. If you look at the post-2014, it's all actual confusion. I'd also like to refer the court to the booking.com case by the U.S. Supreme Court. In that case, it actually does specifically take issue and discuss genericness surveys. It calls into the Justice Scalia's majority opinion refers to it a little bit, but the concurrence by Justice Sotomayor and also the dissent by Justice Breyer goes into significant length about issues with respect to consumer surveys as it relates to genericness. As you all had noted this morning, Your Honors, one of the issues is if you do not know and you're not a relevant purchaser, that that survey means absolutely nothing. What about Mr. Castaneda's response that there was a line in the survey for I don't know? So it is consumer behavior that that is not sufficient. You have to have control questions at the front to identify that you're first of all a relevant consumer so that your opinion matters. Those last questions are one of the huge flaws, and our rebuttal expert during the trial identified why that's not enough. And that survey was fully rejected by the jury because of that, among other things. I have a couple questions that don't relate to genericness, I guess, but one of them deals with the false advertising claim. Can we talk about that for a second? My understanding is that when I read the complaint, it's not readily apparent that there was a claim for false advertising. What's your position on that? If we believe that that was erroneous to include that, what would be the remedy? So the pleading itself actually referred to unfair competition and cited to 1125A. And I would refer the court to the Lexmark decision, also from the U.S. Supreme Court, where it talks about both A and B of subsection A, talking about false association and false advertising. And I would say that the elements of the claim were pleaded within the count sufficiently to state a claim. And that's all that's required. Isn't the count, though, labeled federal false designation of origin and unfair competition? I mean, that's a specific call out to sub, sub, sub A, right? I wouldn't agree with that, Judge. Isn't that what it's called? I'd have to pull the statute up, but isn't that what— There's no specific label assigned to sub A or sub B. Does the language false designation of origin or unfair competition come out of A? It doesn't come out of A. It comes out of the heading that leads into both A and B. So it goes to both. And I would direct the court's attention to some language in the Lexmark case where the court actually talks about and refers to—it's discussing standing in terms of false advertising in that case. And it refers to the purposes enumerated as it's trying to determine what is required for standing. And it says most of the enumerated purposes are relevant to false association cases. A typical false advertising case will implicate only the act's goal of protecting persons engaged in commerce within the control of commerce against unfair competition, therefore signifying that reference to unfair competition does, in fact, include false advertising. The parties submitted joint pretrial statements to the court prior to the trial. Both parties referenced 43A, which is 1125A in the statute. Counsel did not ask for further clarification. And both sub A and B were included in our proposed jury instructions that were submitted. So— May I ask you a question about the permanent injunction? Is it—maybe I misread it, but I thought that the district court had enjoined NOCO from using the word tender. Is that accurate? Tender is included, and it is throughout the record that they were using tender alone as well as battery tender. But isn't—let me just ask you a question. Isn't that somewhat overbroad because couldn't you have said something like you can use a NOCO battery on your tender boat? I mean, isn't that overbroad to prohibit them from using the word tender? I mean, you don't have a trademark on the word tender, do you? No, Judge. But I think that your question is outside their record, and I don't think that there's any indication that they would be referring to a tender boat in connection with their business. And the injunction itself specifically limits the restrictions to battery-related products. So I don't think that it's going to go outside of source indicating, and it also refers to confusingly similarity. So to the extent that tender was referred to in a sentence, I don't see that in their record at all or that that is something that possibly could happen with respect to the advertising to make it overbroad. Can I ask you a VDOTPA question? VDOTPA.  Having now done a little bit more research, you know, sort of having asked you guys the questions, is there really any doubt, though, that we, consistent with our prior panel precedent rule, are entitled to look not only to the state Supreme Court decisions but also to the DCAs for guidance? Judge, I don't agree that there is a conflict in the law as it relates to this case. So the cases that are cited in terms of VDOTPA within the state of Florida, both the Florida Supreme Court case of PNC, which is PNR, excuse me, is relied upon by the cases Stewart as well as Caribbean Cruise Lines. Everything traces back to PNR as the Florida Supreme Court case there. The issue that all of those courts are grappling with is whether or not something constitutes an unfair and deceptive trade practice. In reaching that result, PNR, the Florida Supreme Court, said and pointed to the FTC definition of what constitutes an unfair and deceptive practice from 1964. The statute was amended several times, including through, and it refers to specifically, the year 2017. The policy statement was updated, but none of this matters for us. So the new policy statement does refer to consumer injury, and although they don't actually cite it in the cases, it appears that that's where it's derived from. There's a Porsche case from the third DCA, and they actually go through an analysis, and they cite actually back to the statute for the first time. There's not a lot of citations to the statute. There's two subsections. But Judge Warner in the fourth DCA and Stewart specifically said that you actually have to have actual injury to a consumer, that you have to have, you must show that a consumer was injured or suffered a detriment. Correct. That is what the case said, but they were referring to a different subsection that does not apply here. Specifically, the 501203 in the definitions talks about a violation of this part, and it refers to A, B, and C. And the Porsche case, the third DCA case, talks about and refers to 501203 subsection 3, which is the definition, and then B. And it says that a violation of the act, a violation of this part means any violation of this act or the rules adopted by this act and may be based on any of the following. So there's three different ways to find unfair act. And this is where the cases that we're all looking at talk about B, which says the standards of unfairness and deception set forth and interpreted by the FTC. So all of those cases are looking at the FTC and the quoted language in both PNR and then also Stewart and the other case are identical with respect to the consumer injury as it relates to the second policy statement. What is the consumer injury here? In 1980. I didn't think the district court judge made a finding that there was an injury to a consumer. He just basically said that there was an injury to you, the entity, but that's not an actual consumer. But in our case, trademark infringement is per se an unfair act. And that's what all the cases consistently hold because it's not under B for the FTC. So you're claiming that under FDUPTA, the fact that you had a trademark infringement, that that is sufficient to satisfy a violation of FDUPTA? 100% judge. And all the cases are clear. There's not a single case that says that a trademark infringement does not constitute FDUPTA. If you've proven likelihood of confusion, if you've sufficiently alleged a Lanham Act claim, you have made a claim for FDUPTA. And there's various cases that go through that analysis specifically in the district courts, and I can refer. What supports that position under Florida law? I would refer the court to 501203, the statutory text itself. That's not my question. What case law supports that position under Florida law? I would refer you to the Porsche decision in the third DCA, and they specifically cite to this section of FDUPTA. And in doing so, it became clear, at least to me when I was reading through it, that we are under subsection C, which says an unfair act can also stem from any law, statute, rule, regulation, or ordinance which prescribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices. Subsection C is where the Lanham Act falls. The Lanham Act is, in fact, an unfair practice. There's no additional burdens. And I would further direct the court to the party's pretrial submissions, because NOCA did not raise this issue below until its JMOL at the end of trial. Both parties agreed that if you meet the standard for trademark infringement, then you have met FDUPTA. Both our jury instructions, as well as theirs, said if you meet this, then that. There's also a decision from Judge Bloom in the Southern District of Florida. Nutraceutical, I believe, is the case there, and she also goes through that analysis, and she says if you have a trademark infringement claim, it is per se a FDUPTA claim. And it's specifically in the statute. Can I ask you again? I know we're kind of pushing you around, but before your time expires, I talked to Mr. Castanis about the theory of trademark infringement tied to the keyword purchases. Yes. Assume, for purposes of this question, that I agree with Mr. Castanis and his amicus, that those are not trademark infringement. There are some other things going on, right? There are some ads with text in them. What if we agree with you in part with respect to trademark infringement but disagree with you in part? What does that do to the damages calculation, if anything? It doesn't do anything, Judge, because when you look at what the evidence shows, and I would refer the court to PX 122, which is the 2015 business marketing objectives that NOCO submitted. They have a laundry list of things. They're going to do mass e-mail advertisements. They're going to do consumer solicitations. We have numerous e-mails where NOCO is e-mailing retailers, where NOCO is e-mailing consumers, referring to Battery Tender to indicate us, and then also telling consumers that they offer Battery Tender products, telling people that the Battery Tender brand has become generic. That is sufficient under Lexmark to state a claim. Right, right, right, but I'm just saying, like, maybe this is a stupid question, but, I mean, like if a bunch of the instances of trademark infringement are knocked out, then does the damages figure just stay the same? It does, Judge, and the statute specifically does provide that. We have the burden to show sales, and they have the burden to prove non-infringing sales. But I would say that this is not a case about keywords. NOCO, what they did, and throughout the record this is established, they didn't bid on a keyword. They paid so much for a keyword that they had to pay money. It costs more for them to sell a product using our brand than they would make on that sale. And what that did to consumers is they're telling everyone, we sell Battery Tender products, and then if you go on Amazon and you search, you don't even find our products. They completely kicked us out of the brand space by doing that, and it was so expensive to fight back and actually get it so that if someone's searching for us, you can find us. So that's what's talked about through the testimony of buying back the brand space, because when consumers search, they don't even see us. So that added to the confusion. And if you look at everything they were doing in the marketplace, all of their witnesses testified, I told customers all the time that our products are Battery Tender products. That's an infringement. Every single time that they told a consumer, that's infringement. There's testimony that people use Amazon to determine whether or not they're going to stock their shelves with our products. There is, I think, significant evidence of intent as well, and I don't think I'll have time to get into that with you judges, but they reached out in 2016, 2017, 2018. We want to carry on the legacy and passion of the Battery Tender brand. We want to buy your brand. That's what they said. Meanwhile, we didn't know that they were using it already themselves. All right. I think we've got it. Thank you so much. Mr. Castanis, you've got three minutes remaining. Thank you, Your Honor. Let me see if I can go down and answer the questions that have been asked of my friend over here. Judge Lagoa, you asked my friend about the false advertising claim. Her answer was, well, the elements were sort of in the complaint. I think the answer here really is do a text search of the transcript in this case. Look how many times the term false advertising was utilized in the testimony that came in. You know what you'll find? You'll find two references by an expert witness to the words false advertising describing her prior work, not this case. And on that, I want to point the court to the Johnson & Johnson case that's cited in our briefs. At footnote three, this court says that a plaintiff, and I quote, must produce some evidence of consumer reaction to the ads. DTC produced none. As I told you, even the three instances of actual confusion that they claim exist on this record are not tied in any way to the ads. They are not reactions to the ads. Judge Lagoa, you also asked my friend if DTC has a trademark on Tinder. She answered, we do not. That shows two things relevant to this case. First, instructional error. We objected to including Tinder as something that would be an infringement if we used it, and that was rejected by the court under the Mark Siteman case that we cite, because you cannot tell if the verdict was based on that erroneous instruction or not. You get a new trial. If you can't tell Judge Newsom whether the verdict was based in part on keyword bidding, which is impermissible, then it's at least a new trial. The verdict form was not allocated. The damages were not broken up, so I wouldn't know how to figure out the false advertising damages. That's exactly right. Maybe all of the damages that the jury found were attributable to what they thought was false advertising. Maybe it was all due to keyword bidding. Maybe. Who knows? But the fact is, that's why there's a new trial. I understand Judge Lagoa that the state courts have a two-issue rule, but that doesn't apply in federal court here, and there are cases from this court that make that clear. I can't bring myself to pronounce the acronym, the Florida Unfair Trade Practice Statute. The law is clear. This court in Oonjian has said that actual consumer injury is a requirement. Stewart says actual consumer injury is a requirement. We've cited in our letter to the court that even DCA decisions are the law of the state for purposes of this court. Is there anything to her response to my questions about those same cases, that they're dealing with another provision of the statute, and that here I was, frankly, I'll have to follow up and make sure I can follow through, but that those are about A and this is about C or some such? Judge Newsom, I confess that I wasn't able to follow that argument either, and I think I may have heard the citation to a new case that wasn't in their brief. Maybe I just misheard, but in any event, it's clear that Florida law is uniform. And by the way, it makes perfect sense that this statute would say, well, you can bring a claim, but you still have to show actual consumer injury even if you're not a consumer. I just want to be clear. The district court did not find that there was an actual consumer injury. The district court did not find that. The district court's analysis was sort of circular. It said you could be a consumer. The district court found that they were a consumer, but not that there was an injury to an actual consumer. There's no treatment of that issue at all in the Rule 50 orders. And as I was just going to say very quickly, it makes perfect sense. It's not unlike antitrust law where a plaintiff may have standing to bring an antitrust law, but that plaintiff has to show injury to competition as part of the elements of its claim. I think with that I have answered all of the questions that you put to my friend that I wanted to answer. The only thing I would ask the court to do here is to reverse as a matter of law on either genericness or lack of likely confusion or of lack of any showing of harm by this holding company. Alternatively, we're entitled to a new trial. And finally, with regard to the extravagant disgorgement award, that was wildly untethered to any of the proofs at trial. My friend, in answering Judge Newsom's question here toward the end of her argument, said that the damages, they didn't have to prove damages, they just had to prove our sales. Well, that was as to the disgorgement aspect of the case. That wasn't as to the $1.3 million and the punitives that were awarded by the jury here. We are, in this case, paying millions of dollars in cost to maintain this appellate bond on this extravagant, extravagant judgment, and we ask that it be reversed. Thank you very much. Thank you so much. All right, that case is submitted. Fourth and final case of the day.